**WORLDWIDE BASKETBALL AND SPORTS TOURS, INC., et al., Plaintiffs,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.**

No. 2:00–CV–1439.

United States District Court, S.D. Ohio, Eastern Division.

July 28, 2003.

934

Wilbert Benjamin Markovits, Markovits & Greiwe, Waite, Schneider, Bayless & Chesley Co., LPA, Cincinnati, OH, for plaintiff.

James A. Wilson, Jr., Vorys, Sater, Seymour & Pease, Columbus, OH, Gregory L. Curtner, David R. Grand, Miller, Canfield, Paddock & Stone, Ann Arbor, MI, for defendant.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of Plaintiffs' Motion for Permanent Injunctive Relief to enjoin the Defendant National Collegiate Athletic Association's ["NCAA"] enforcement of the "Two in Four Rule." For the reasons that follow, the request for Permanent Injunction is GRANTED.

### I.

### Introduction and Summary

This case involves a claim by a group of sports promoters that the NCAA has violated federal antitrust law by limiting Division I college basketball teams from participating in more than two exempt tournament events in any four year period. For decades, the NCAA has treated certain tournaments as "exempt," meaning that teams may play in a series of games without each game counting towards the maximum number of games playable per season. In a policy known as 98–92, in 1999, the NCAA adopted a rule which required that no team play in more than two such tournament events every four years. ("Two in Four Rule.")

As described in detail below, in Section II(B), the rule has resulted in a 43% reduction in exempt tournament games, a 32% decrease in tournaments, and a 3.3% decrease in games scheduled by Division I teams.

Under traditional antitrust law analysis, the producers of a product—in this case, men's college basketball—may not combine and agree to a limitation on the output of such product. To a certain extent, the NCAA has the appearance and the ability to act as a horizontal combination of all college basketball teams and limit output, which would be clearly unlawful if undertaken by private business entities.

The NCAA, however, functions quite differently than traditional combinations designed to reduce output and limit competition. Courts have recognized, as outlined below in Section V, that the NCAA has important rule-making functions, such as establishing the rules of the game, and protecting the welfare of student athletes. While acting in this rule-making capacity, the NCAA is not subject to traditional antitrust limitations.

Instead, the Courts have applied a concept known as the rule of reason, described in Section V. If the plaintiffs show that a rule of the NCAA has a substantially adverse effect on competition, the NCAA must justify the anti-competitive effect with countervailing beneficial justifications. As an example, if the NCAA concluded that the number of games played per season were adversely affecting the welfare of a student-athlete, an across the board reduction in number of games would have an anti-competitive effect, but would no doubt be justified.

In this case, as described in Section V(2), the Two in Four Rule has caused a substantial reduction in the number of school-scheduled basketball games. Under the rule of reason, the NCAA must establish a bona fide justification, demonstrating the virtues of the policy. The NCAA asserts that the rule limits the number of games played per season out of concern for student welfare, and gives lesser-known schools more opportunities to play in desirable tournaments. (Section V(2)).

Neither of these justifications are credible. At the same time the Two in Four Rule was adopted, the NCAA actually increased the overall number of games each team could play per season. Consequently, while the number of school-scheduled and exempt games were reduced, the overall number of games increased, hardly benefitting student welfare. (*See* Section V(3)). Further, the number of exempt games played by lesser-known, non-power conference teams has actually decreased, resulting in harm to the class of teams which the NCAA claims its rule would benefit.

In the absence of an offsetting benefit, a rule which simply limits output and competition to the detriment of the consumer violates federal antitrust law. It is beyond dispute that the NCAA may limit the number of games playable per season and may promulgate rules which adversely impact promoters of sports tournaments. Because it is a combination of all producers of Division I men's basketball games, however, the NCAA may not act in an anti-competitive manner without promoting a beneficial interest.

## II.

This action was filed by the Plaintiffs, who are sports promoters engaged in scheduling tournament-type events involving Division I mens' college basketball. The Defendant NCAA is an unincorporated association comprised of four-year colleges, universities and athletic conferences. Plaintiffs contend that the NCAA's "Two in Four Rule" is a violation of federal antitrust laws, specifically, §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

Plaintiffs' request for injunctive relief was first heard by the Court in mid–2002. On July 19, 2002, 2002 WL 32137511, this Court issued an *Opinion and Order* holding Plaintiffs' request for permanent injunction in abeyance, pending further proceedings as to the effect of the Two in Four Rule in years three and four of the rule's cycle. On February 28, 2003, Plaintiffs renewed their request for permanent injunction, arguing that there now exists sufficient evidence to justify enjoining the rule as an antitrust violation. The NCAA disputes this contention. Before addressing the merits of the dispute, the Court provides a brief background summary.

The NCAA is a non-profit, tax-exempt organization headquartered in Indianapolis, Indiana. The NCAA essentially functions as a standard-setter, although in the area of mens' college basketball, it is also the sponsor of the well-known end of season NCAA Tournament. In its capacity as standard-setter, the NCAA establishes the maximum number of regular season mens' college basketball games that may be played by teams in Division I.[1]

---

1. Division I schools are typically large colleges or universities. By NCAA rules, Division I teams must play a large percentage of games against other Division I schools. Division I schools may offer athletic scholarships and are recognized as sponsoring the most competitive level of college athletics. There are currently 330 teams in Division I. Although this number varies from year to year as some teams drop out of Division I and other teams are added, the variance has never been more than ½ of 1% of the current number.

In 1997, the NCAA began work on legislation known as Proposition 98–92. The rule applies to what are termed "exempt" events, which are multi-game tournaments. From their inception a number of decades ago, exempt events, which are typically held pre-season or during school vacation periods, did not count towards the cap on the number of games a team could play per season. The rule limits a team to playing one exempt event per season, and no more than two in any four year period. Further, an exempt tournament now counts as a single game towards the season limit, although the Plaintiffs do not challenge this portion of the rule. The Two in Four Rule, codified at NCAA Bylaw § 17.5.5.3 is a component of 98–92. The rule provides:

> **17.5.5.3 Certified Events.** An institution shall be permitted to participate in no more than one certified event during a given academic year and not more than two certified events every four years. Participation in a certified event shall count as a single contest in the institution's maximum contest limitations. Such events, other than a foreign tour ... must be certified by the Championships / Competition Cabinet Subcommittee on Certified Events pursuant to Bylaw 30.10.1....

*Defendant's Exhibit* 1. The Two in Four Rule does not apply to the NCAA's post-season Tournament or to conference tournaments.[2] (NCAA Bylaw § 17.5.5.1.1). Proposition 98–92 was ultimately approved by the NCAA Board of Directors in January 1999. A separate component of the legislation was the provision of an additional game to the maximum allowed during the regular season. Thus, the number of games in the Division I mens' season increased from 27 to 28.[3]

As this Court observed in its first *Opinion and Order,* the issue of exempt events has been a concern of the NCAA and its institution members for some time. Initially, exempt events were required to be played outside the 48 contiguous United States, in the locales of Alaska, Hawaii or Puerto Rico. Later, the NCAA allowed the events to be played in the continental United States. In the late 1980s, the NCAA Presidents' Commission expressed concern over the impact of intercollegiate athletics on academics, particularly in the areas of mens' football and basketball. In 1990, the NCAA adopted bylaws to limit the number of regular season games, to regulate the start times for practices and the extent of pre-practice conditioning activities, to set the date for the start of a season and to limit the number of games any single student could play.

In 1990, the NCAA also adopted a "one in four rule," which restricted participation in any particular event to once in every four years. In the early 1990s there were few exempt events.[4] The events grew in number in the mid to late 1990s, as the following chart demonstrates:

---

**2.** Many Division I basketball teams play in conferences, such as the Big 10, the Big 12, the Big East, the Pac 10, the Southeast Conference and the Atlantic Coast Conference. Games played in intra-conference championships or in the NCAA championship do not count as games played for purposes of the limitation on games played each year, as established by the NCAA.

**3.** For the reasons explained in the Court's previous *Opinion and Order,* this part of the legislation will not be considered by the Court in assessing the effects of the Two in Four Rule on competition in the relevant market. As will be seen *infra,* however, the result in this case would remain unchanged, even if this unchallenged part of Proposition 98–92 were included in the analysis.

**4.** In 1996, the NCAA began the process of "certifying" exempt events by way of a Certified Events Subcommittee.

| Season Year | Exempt Events |
|---|---|
| 1996–97: | 16 |
| 1997–98: | 19 |
| 1998–99: | 22 |
| 1999–00: | 26 |
| 2000–01: | 22 |
| 2001–02: | 25 |
| 2002–03: | 17 |

This Court previously determined that the Plaintiffs had failed to establish harm under the antitrust law. Because the hearing was held during the second year of the Two in Four Rule, the Court permitted the Plaintiffs to re-apply for injunctive relief after the conclusion of the third year of the rule, when presumably any harm would be apparent. While this *Opinion and Order* addresses the issue of antitrust harm, the Court also incorporates the findings and conclusions reached in its previous *Opinion and Order*.

According to the Plaintiffs, the reduction in the number of events from 2000–2003 demonstrates that the Two in Four Rule has had a substantial adverse effect on output in the relevant market and, is a violation of federal antitrust law. The Defendant disputes this contention. The Court now considers the evidence adduced on both sides of the issue.

### III.

#### A. Nonexpert Testimony as to the Effects of the Two in Four Rule

Plaintiffs have offered the testimony of eight fact witnesses in support of their request for permanent injunctive relief. Four of the witnesses, Mr. Richard Giles, Mr. Lee Frederick, Mr. Christopher Spencer and Mr. Louis Lacy, are promoters of certified exempt events.

Richard Giles, president of the Gazelle Group of Princeton, New Jersey, promoted four certified events in the 2001–02 season: the Coaches v. Cancer Classic, the BCA Invitational, the BCA Classic and the Guardians Classic. According to Giles, the Two in Four Rule had a devastating effect on certified events in 2002–03 season. The BCA Classic was cancelled in 2002–03 because no teams were available to participate. Giles changed the format for both the BCA Invitational and the Coaches v. Cancer Classic to accommodate fewer participating teams. In Giles' estimation, the Guardian Classic had a much less competitive mix of teams participating, which caused fewer people to want to view the tournament this past season.

As for the upcoming season, 2003–04, Giles testified that he has one host site confirmed for the Guardian Classic and he has four teams, out of eight available slots, confirmed with contracts to participate. Giles noted that this number is down from the 2001–02 season when there were 16 available participating slots. For the upcoming BCA Invitational, Giles has secured contracts for teams in a four team tournament. In previous years, the tournament included eight teams. For the BCA Classic, Giles has eight teams under contract as well as a host, Xavier University. For the Coaches v. Cancer Classic, however, Giles has secured a contract with only one team. According to Giles, this tournament is particularly difficult to schedule because of the caliber of teams needed to satisfy the tournament's television contract with ESPN as well as the host site, Madison Square Garden in New York City.[5] Giles is of the belief that the

---

5. Giles testified about the efforts he has made and continues to make to schedule teams to participate in his events. Giles places numerous calls and sends electronic mail (e-mail) to coaches and team schedulers in order to fill all available tournament slots. In particular, from June 1, 2001 to March 18, 2002, Giles sent 1,101 e-mails and made 2,020 calls regarding scheduling. In addition, Giles made thousands of calls to potential tournament sponsors. (Pl. Exhibit 175).

Giles testified that he persisted in these efforts during the pendency of the Court's ruling last year. Giles further testified that he continues to schedule teams for future events on the assumption that the Two in Four Rule

tournaments have been unsuccessful[6] because the Two in Four Rule has limited the number of teams available to participate in certified events in a given year and with that limitation, unique competition provided among teams in tournament format has diminished.

Lee Frederick, president of Sport Tours International of Milwaukee, Wisconsin also offered testimony as to the effect of the Two in Four Rule. Frederick has historically promoted three events which take place during the Thanksgiving or Christmas break. Frederick's events use an eight team, three day format. According to Frederick, only one of his events, in San Juan, Puerto Rico, took place as scheduled. One event was cancelled and another was altered to include six rather than eight teams. Frederick contends that he is unable to schedule some events or to fill others because the Two in Four Rule has limited the number of teams available to participate. Frederick testified that he has secured no contracts for the San Juan event[7] in the upcoming year and has only secured two contracts for the New Orleans event.

Louis Lacy, a promoter for Blue Ridge Sports & Entertainment, Inc. ["Blue Ridge Sports"] of Winchester, Virginia, testified that he promotes events for mens' college basketball, as well as football and golf. The basketball events that Blue Ridge Sports promotes are the NABC Classic, the Cosida event and the America's Youth Classic. Lacy testified that in 2002, both the America's Youth Classic and the Cosida event were cancelled. The NABC Classic did take place, although with decreased ticket sales and a lower profit. On May 13, 2003, the NCAA Certified Events Subcommittee denied certification for the NABC Classic, America's Youth Classic and Cosida events for the 2003 season due to lack of executed venue and participating institution contracts. (Pl. Exhibit 265). Lacy testified that prior to 2002, he did not have difficulties scheduling teams and finding host sites.

Christopher Spencer, of Worldwide Basketball, Inc. in Cincinnati, Ohio, testified that in 2002 he was unable to organize any certified events. In 2001, however, Spencer promoted three tournaments in Las Vegas using a four game format. According to Spencer, the current difficulties are a result of the diminished supply of teams available to play caused by the Two in Four Rule. In his estimation, the lack of teams also impacts upon the ability to find host schools for certified events. As for the upcoming season, Worldwide Basketball, Inc. has plans to promote only two tournaments. Spencer is attempting to sponsor an event at the University of Pittsburgh, which is the only team contracted to participate at this time. Spencer is also making efforts to secure teams for the Las Vegas Invitational. Spencer testified that he has sent out numerous

remains in effect. In view of this unrebutted testimony, the Court rejects Defendant's assertion that the Plaintiffs' events were unsuccessful this past season due to lack of effort on Plaintiffs' part.

**6.** The Court observes that in 2001 Giles promoted 4 events; but in 1998 and 1999 he only promoted 1, in 2000 he promoted 2 and in 2002 he promoted 2.

**7.** On May 13, 2003, the NCAA Certified Events Subcommittee notified the University of Puerto Rico that the San Juan Shootout was being denied certification due to the lack of an executed contract with a participating institution as well as the lack of a manager/promoter contract. The deadline for reconsideration of the decision was June 15, 2003. (Pl. Exhibit 266). The Court notes that American University in Puerto Rico withdrew from the NCAA and was therefore unable to serve as a host school under NCAA rules.

contracts to teams in order to secure participation.[8]

In addition to the Plaintiff promoters, the Court heard testimony from four additional witnesses as to the alleged deleterious effects of the Two in Four Rule. Mr. Fernando Barrueta, who is president of the Hispanic College Fund, testified that his entity has sponsored three events in Division I mens' college basketball over the years. The events are held in Fresno, California, Albuquerque, New Mexico and Baton Rouge, Louisiana. Proceeds from the events are used to award scholarships to Hispanics on a merit and need basis. According to Barrueta, the Two in Four Rule caused the events to be less successful this past season because the competition among participating teams was weak. As a result, the revenues earned by the Hispanic College Fund declined $130,000.00 compared to the previous year.

Mr. Michael Levine, Chief Executive Officer of Van Wagner Sports and Entertainment also testified about the impact of the Two in Four Rule on team scheduling of mens basketball events. Three of Van Wagner's events were cancelled this past season due to inability to secure team contracts. As a consequence, Levine made the decision in August 2002 to discontinue the Events division of Van Wagner Sports and Entertainment. Levine testified that if the Two in Four Rule were not in place, the events division would still be in business.

John Groce, Assistant Basketball Coach at Xavier University, testified that he has been responsible for scheduling events for his team for the past three years. Prior to that, Groce was responsible for scheduling events at three other universities. As a scheduling coach, Groce is the recipient of solicitations for event participation. Groce testified that the quality of the opposing team in an event is important to him. In addition, hosting events is important because it produces revenue for the university and gives his team a home court advantage.

Russell Potts, owner of Russ Potts Productions, Inc., a sports marketing company in Virginia, is involved in promoting mens' basketball and football exempt events. Potts has been involved in the sports promotion business for thirty-seven years. In the mid 1990s, he sold the Russ Potts Productions, Inc. business to Dorna Sports, of New York. Potts worked for Dorna for approximately one year and then resumed his own business under the Russ Potts Productions, Inc. name.

In Division I mens' basketball, Potts has promoted four events: the Colonial Classic, the Jim Thorpe Classic, the John Thompson Foundation Classic and the Hispanic College Fund Classic. Potts has used a four team format in tournaments which his company has sponsored. The events take place during the Thanksgiving and Christmas holidays. All four events took place in 2001, although Potts testified that it was difficult to secure team participation. In 2002, only three of the four events took place due to the diminished number of available teams. According to Potts, two of the events lost money and one event was moderately successful. In addition, in 2001, Potts received over $100,000 from corporate event sponsors, but in 2002 no corporations sponsored his events. Potts testified that he has no events scheduled for 2003.[9]

---

8. Spencer testified that it is not unusual, however, for teams to withdraw from events even after a contract for participation has been executed. Thus, according to the Plaintiffs, the existence of a contract does not necessarily guarantee team participation.

9. The Court notes that in 2001 Potts promoted four events, the most events his company ever sponsored. In 1996, he promoted only 1 event; in 1997, 2 events; in 1998, 1 event; in 1999, no events because Dorna was the promoter; in 2000, 2 events; and in 2001, 4 events.

## B. Expert Testimony on the Effects of the Two in Four Rule

### *Dr. Tollison's Opinion*

Dr. Tollison, Professor of Economics at Clemson University [10], provided expert testimony on behalf of Plaintiffs. Tollison is a well-known educator and writer in the field of economics. He holds a Ph.D. from the University of Virginia and an M.A. from the University of Alabama. Dr. Tollison has been a professor of economics since 1965. He has published hundreds of papers on economics and is the author of several textbooks on economic study. Tollison has received several Distinguished Faculty and various other awards throughout his career. Tollison is also a member of the Editorial Board of the *Journal of Sports Economics*. In 2001, he was named Researcher of the Year in the Department of Economics and in the School of Business at the University of Mississippi.

Tollison is of the opinion that the Two in Four Rule has had a substantial adverse effect on output in the relevant market, as demonstrated by the decrease in games as well as by the difficulty Plaintiffs have experienced in scheduling events during the past season as well as for the upcoming season. According to Tollison, the relevant market consists of all mens' college basketball games played in Division I.[11] He defines a relevant submarket as pre-season and post-season tournament event games, although he concedes that the submarket definition of Louis Guth, the Defendant's expert, as school-scheduled games [12], is also accurate. According to Tollison, games played in Division I are not fungible commodities. Therefore, Tollison testified that he did not find it necessary to perform a cross-elasticity study. Tollison concluded that the Two in Four Rule has had a substantial adverse effect regardless of whether the market or submarket is considered.

According to Tollison, the quality of the teams playing in Plaintiffs' events has an impact on price and output in the relevant market. Tollison measures quality by the experience of certified event promoters during the past season, as well as the comments of sports writers and conference commissioners. According to Tollison, the diminished quality of teams has led to less interesting match-ups, reduced sponsorship, lower ticket sales and less media coverage of events.

Both Tollison and Guth agree that in the 2002–03 season a net reduction of seventy-two (72) exempt games occurred, in comparison to the 2001–02 season. This represents a 3.3% reduction in school-scheduled games. The number of games played in certified events declined by 107 from 2001–02 to 2002–03, from 251 to 144, or 43% of total certified games, and 28% of net games. In the same period, the number of certified tournaments dropped from 25 to 17, which represents a 32% reduction.[13]

10. Dr. Tollison begins this position in the upcoming academic year. He was formerly employed as a Professor of Economics at the University of Mississippi.

11. Tollison relies on the views of coaches, athletic directors, NCAA officials, conference officials and commentators in support of this definition.

12. School-scheduled events are games which a team is not required to play. Teams are required to play a certain number of games within the teams' conference, the conference tournament, or the NCAA tournament. School-scheduled games, as the term connotes, are selected by the school's scheduling coach.

13. Both experts looked to a net figure since teams which one year played in, for example, a two game tournament, had one game counted toward the twenty-eight game cap. If the team did not play in any tournament games the next year, it would be able to schedule one additional game to make up for the fact

As to the 2003–04 season, Tollison opines that the effect of the Two in Four Rule on certified events will be even more pronounced because there will be fewer eligible teams to participate (193) and only seven "power conference"[14] teams will be eligible. Tollison uses the 2001 season as the baseline for measuring the alleged substantial negative effect of the Two in Four Rule. According to Tollison, this is the appropriate measurement because it was the year when each team had an unfettered chance to participate in certified events.[15]

Tollison fails to find any procompetitive effects associated with the Two in Four Rule. According to Tollison, the rule is unlike other rules of the NCAA, such as regulation of season length. Further, Tollison believes that the rule does not advance the concern of athletes missing class time, since no specific provisions of the rule relate to scheduling around classes, vacations, travel, or other factors as to potential missed classes. Tollison also concludes that the rule has not advanced the ability of lesser known schools to participate in certified events.

Tollison believes that there are less restrictive alternatives than the Two in Four Rule that would achieve the objectives of the NCAA. First, Tollison contends that the NCAA should consider missed class time in all sports, not just mens' basket-

ball. Second, the Two in Four Rule does not address the scheduling or travel associated with the 4,830 games played by Division I teams not including the 144 exempt games played in 2002–03. Consequently, the rule cannot seriously affect student athlete welfare by targeting fewer than 2.2 % of all games played in Division I. Third, in order to control the number of games played, Tollison contends that the NCAA could limit participation by teams to only one certified event per year. Tollison argues that this would better achieve the objective of enabling a non-power conference school to play a major school on a neutral court.

As stated above, Tollison did not perform a study of the effect of the Two in Four Rule on consumers of Division I mens' games. According to Tollison, the loss of games necessarily constitutes a loss to consumers in the relevant market because college basketball events are not fungible.

### Defendant's Challenge to the Sufficiency of Tollison's Expert Testimony

■ As indicated during the Permanent Injunction Hearing, the Court now considers the Defendant's challenge under Fed. R.Evid. 702 to the sufficiency of Tollison's proffered opinion testimony. According to the Defendant, Tollison's testimony is deficient because he has failed to perform

---

that the previous year's tournament had counted as one game. The gross number of exempt games fell by 107 from 2001–2002 to 2002–2003.

14. A "power conference" team refers to a team that is a member of one of the Big 6 conferences. The Big 6 consists of the Atlantic Coast Conference, the Big 12, the Big East, the Big Ten, the Pac 10 and the South East Conference.

15. In contrast, Guth uses an "averaging" method to assess the effect of the Two in Four Rule. Guth testified that he would use a three

year average of the number of games before the Two in Four Rule and compare that with number of games after the rule to assess the effect of the Rule. This method derives from Guth's view that the number of certified events in 2000 01 was unnatural because of the impending unknown effects of the Two in Four Rule. The Court rejects Guth's view on the appropriate baseline for measuring the effects of the Two in Four Rule since Guth provided no supporting data as to this theory. The Court agrees with Tollison that the logical baseline is the 2000–01 season because that is the year in which all teams were eligible to participate in certified events.

work to support his definition of the relevant market as well as to support his opinion that the Two in Four Rule has had a substantial anticompetitive effect in that market.

Rule 702 requires that the trial judge perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

This Court's gatekeeping role is twofold. First, the Court must determine whether the proffered testimony is reliable. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief. *Id.* Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but by a preponderance of the evidence that it is reliable. *Wellman v. Norfolk & Western Railway Co.*, 98 F.Supp.2d at 923 (S.D.Ohio 2000), citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir.1994).

The Supreme Court in *Daubert* set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable. They are:

> (1) whether the theory or technique has been tested;

> (2) whether the theory or technique has been subjected to peer review and publication;

> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

> (4) whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court stressed that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability. *Id.* at 150, 119 S.Ct. 1167. The test of reliability, however, is a flexible one and the four Daubert factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *Id.*, quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

The particular *Daubert* factors that this Court considers depends upon the unique circumstances of the expert testimony involved. *See Kumho Tire Co.*, 526 U.S. at 151–52, 119 S.Ct. 1167. As the Sixth Circuit has recognized, there is need for flexibility when the expert testimony at issue is non-scientific. *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 332 (6th Cir.2001).

In this case, the Court finds that Tollison's proffered testimony as to the definition of relevant market is reliable. Tollison defined the relevant market as Division I mens' basketball, which is essentially the same market definition Tollison used when this Court first considered the merits of Plaintiffs' request for injunctive relief. Furthermore, the De-

fendant also uses Division I mens' college basketball as the relevant market.

Defendant's challenge to Tollison's testimony centers more on his definition of appropriate submarkets than on his definition of the market. As noted *supra*, Tollison defines one submarket as pre-season and post-season tournament games. As the Defendant points out, Tollison fails to offer a basis from which to conclude that this is an appropriate definition. Rather, Tollison testified in conclusory fashion as to the definition and parameters of this submarket. Furthermore, in opining on the effects of the Two in Four Rule, Tollison failed to render any opinion as to the effect in the proffered submarket. The Court finds that Tollison's testimony as to tournament games submarket lacks a sufficient indicia of reliability to be admissible for purposes of Rule 702. Thus, the opinion is appropriately excluded.

■ The Court notes that Defendant also challenges the reliability of Tollison's definition of submarket on the basis that Tollison failed to perform a cross-elasticity analysis, *i.e.*, an empirical analysis of consumer sensitivity to price levels at which they elect substitutes for the product or service lost. The Court notes that, Louis Guth, the Defendant's expert, who is also a well-known writer in the field of economics, similarly failed to perform any of the studies which the Defendant asserts Tollison should have undertaken. Tollison concedes that he failed to perform a study but, in his view, a study was unnecessary because Division I mens' basketball games are not fungible. The Court finds that, while a such a study would be helpful to assess the effect of the rule on consumers, the lack of a study does not, by itself, render Tollison's opinion unreliable. The absence of a study affects the weight of Tollison's opinion as to the submarket of tournament games more than it affects its reliability under Rule 702. Nevertheless,

as stated above, the Court finds that because Tollison offers no basis from which to conclude that a submarket of pre-season and post-season tournaments is an appropriate definition, the Court does find Tollison's submarket definition unreliable and the Court ignores the same.

The Court does note, as described *infra* in Section V, that Guth himself, in his earlier testimony, opined that the appropriate relevant submarket consisted of school-scheduled games. Tollison testified that, in his opinion, this definition of the relevant submarket was also accurate, and one he agreed provided proper analysis. To this extent, Tollison and Guth agree. As will be explained below, the Court believes that school-scheduled games are the relevant submarket.

Defendant presents an additional challenge to the reliability of Tollison's opinion as to the asserted anticompetitive effects of the Two in Four Rule. Defendant characterizes Tollison's opinion as "supported only by a series of tautological arguments based on untested assumptions, and self-serving, unchecked, inaccurate anecdotes." (*Motion in limine* at 3). In Tollison's view, the Two in Four Rule has had an anticompetitive effect whether viewed in the context of the overall market of Division I mens' basketball or in the context of a submarket because the number of games has declined. Tollison also finds anticompetitive effect by virtue of his belief that quality of games has diminished.

■ There is no dispute that the number of games has in fact declined. Thus, the Court finds no reason to reject Tollison's opinion that this decline constitutes an anticompetitive effect. With respect to quality, however, Tollison's opinion is less reliable. When questioned as to the indicia of quality on which he relies, Tollison stated that the purportedly less-interesting match-ups in certified events this past sea-

son were noted by sports commentators. Tollison further stated that there was reduced sponsorship revenues, ticket sales and media coverage. Tollison conceded, however, that he did not perform any studies to measure these purported effects on quality.

In the Court's view, because Tollison's testimony as to decline in quality is not supported by any objective evidence, testimony, or study, his opinion is unreliable for purposes of Rule 702. Thus, to the extent Tollison opines as to diminished quality because of the Two in Four Rule, his testimony is excluded.

Defendant's Motion to Exclude Tollison's proffered testimony (Doc. # 107) is GRANTED in part and DENIED in part.

### Louis Guth's Opinion

Mr. Louis Guth, Senior Vice President of the National Economic Research Association, testified on behalf of the Defendant NCAA. Guth holds a Bachelor's degree in Economics from Harvard University and a Master's degree in Economics from the University of Pennsylvania. Guth has taught economics at the University of Pennsylvania and he has served as an Assistant Professor of Economics at the Graduate School of Business Administration at New York University. Guth has provided expert testimony in several antitrust cases and he has performed several economic studies in the area of regulatory matters. The Court concludes that both Guth and Tollison are highly-qualified experts.

Guth offers three opinions in this case: (1) the Two in Four Rule, and the larger piece of legislation, 98–92, are appropriate rule-setting standards by the NCAA to limit the number of season games as well as the number of games which count in the season; (2) the rule has a reasonable, procompetitive effect; and (3) the overall effect of 98–92, including the Two in Four Rule, has been to increase output and create a framework for certified events to evolve.

In reaching these conclusions, Guth finds the relevant market to be Division I mens' college basketball. Guth defines the relevant submarket as school-scheduled games because those games are close substitutes for certified events in that market since both categories involve games for which schools receive invitations which may be accepted or declined. Guth testified that each school in Division I has approximately 11 slots to fill with games selected by the university or college. In Guth's view, these school-scheduled games are distinguishable from conference tournaments or the NCAA tournament. Guth therefore finds Tollison's definition of a submarket that includes these tournaments erroneous. As indicated above, the Court finds Tollison's definition of submarket as to tournament games to be unreliable. Tollison did, however, testify that Guth's definition of a submarket of school-scheduled games is also accurate. Both Guth and Tollison testified that an appropriate submarket consists of school-scheduled games. The Court agrees and adopts this submarket as the starting point of analysis.

Guth testified that the relevant market could consist of all Division I games, or school-scheduled games, the latter being the relevant submarket in his analysis given in the 2002 hearing in this case. Because schools are not free to schedule in-conference games or tournaments, but are free to schedule remaining games between single events or exempt games, this Court finds that school-scheduled events are the appropriate relevant market.

Guth takes issue with Tollison's opinion regarding the alleged anticompetitive effects of the Two in Four Rule. Guth contends that Tollison finds anticompetitive effects simply by focusing on the harm to

Plaintiffs. Guth opines that even though there has been a decrease in certified events this past year, because there are close substitutes for the events, *i.e.,* other school-scheduled games, this negates the effect of the loss in the relevant submarket.

Guth's opinion derives from his focus on Proposition 98–92 as a whole. Guth emphasizes that there are three aspects to the 98–92:(a) the Two in Four Rule, (b) a change that requires participation in an exempt event, regardless of the number of games played, to count as one game towards the season limit, and (c) the addition of the 28th game to the season. According to Guth, the overall effect of 98–92 is not anticompetitive. Further, Guth opines that 98–92 fosters competitive equity by creating uniformity among schools as to the number of games played in a season.

Guth contends that the Rule falls within the role of the NCAA to establish standards of play which is essential for the very existence of the product at issue— Division I mens' college basketball. Therefore, according to Guth, the number of games played is always subject to the constraints of the NCAA. Guth testified that the decline in certified events from 25 to 17 this past season does not have a substantial anticompetitive effect on the overall market of Division I mens' basketball. Guth believes that the decrease reflects a reasonable market reaction. Further, Guth opines that the high number of certified events in the first two years of the rule is simply a consequence of teams scurrying to occupy events based on the fear of the unknown effect the rule would have in future years.

Guth noted that with the Two in Four Rule, there will be at most 165 teams eligible to participate in certified events each year, which means that there could still be between 15 to 25 certified events. The Court notes, however, that simply because teams are available does not mean that they will elect to participate in certified events or that the market could support tournaments including lesser-known, non-power conference teams. The evidence presented at the hearing demonstrates this fact. All of the Plaintiffs have experienced difficulty in scheduling events and it is undisputed that the number of events and games played in those events has declined.

Guth testified that the rate of participation in certified events by "power" conference teams declined in 2002–03 to 24.8, from 33.5 in 2001–02. Guth contends, however, that this is mitigated because the rate of participation by non-power conference teams allegedly increased to 75.2, from 66.5 in the 2001–02 season. (Def. Exhibit 586P). Guth admitted, however, that the non-power teams for whom the Two in Four Rule was in part designed to benefit, played in fewer certified events in 2002–03. The number of games played by non-power teams declined by more than one-third in 2002–03.

In his testimony during the first hearing in this Court, Guth stated that the relevant submarket was school-scheduled games, which he noted in his more recent testimony, is still an accurate conclusion. Guth opines that even considering the submarket of school-scheduled games, the Two in Four Rule does not have a substantial anticompetitive effect. Again, Guth reaches this opinion by considering Proposal 98–92 as a whole and by maintaining that any actual loss of games in the market has to be considered in view of the fact that the product at issue is an NCAA-created product as well as the fact that, in his view, the rule has the effect of standardizing schedules.

Guth conceded on cross-examination, however, that while he believes mens' basketball games are fungible, there is more

consumer demand for games between certain schools. Guth did not perform cross-elasticity studies or pricing studies of the market. Further, Guth testified that he did not study the demographics of the types of people who attend certified events.

## IV.

Plaintiffs' request for permanent injunction is made pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, which provides:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

15 U.S.C. § 26.

In order to obtain an injunction under § 16 of the Clayton Act, the Plaintiff "must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Under this standard, the Plaintiff must demonstrate "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

## V.

Plaintiffs allege that the Two in Four Rule violates § 1 of the Sherman Act. This statute provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

15 U.S.C. § 1.

The Supreme Court has explained the significance of the Act as follows:

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic, political and societal institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the Several States."

*Northern Pacific R. Co. v. United States*, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

Since, however, nearly every contract that binds parties to an agreed course of conduct "is a restraint of trade," to a certain extent, the Supreme Court has limited § 1 of the Sherman Act to only the prohibition of "unreasonable restraints of trade." *NCAA v. Board of Regents*, 468 U.S. 85, 98, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Thus, in order to prevail on a claim under § 1, the Plaintiffs must show that (1) there is an agreement, conspiracy, or combination between two or more enti-

ties; (2) the agreement is an unreasonable restraint of trade under either a *per se* or a rule of reason analysis; and (3) the restraint affects interstate commerce. *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir.1998).

With respect to the first element, there is no dispute that the Two in Four Rule was formed as a result of an agreement by NCAA members. It is the second element in this case which is the most contested. In its prior *Opinion and Order*, this Court held that the *per se* approach[16] does not apply to this case. This Court further held that the full rule of reason, rather than the quick look analysis, applies to the Plaintiffs' antitrust claim. As the Court held, the Two in Four Rule "simply does not have the 'obvious anti-competitive effects' ... so as to dispense with the full rule of reason analysis." (*Opinion and Order*, 2002 WL 32137511, at *7).

Under the full rule of reason analysis, Plaintiffs bear the initial burden of showing that the Two in Four Rule has a substantially adverse effect on competition. If this burden is met, the Defendant must then show the procompetitive virtues of the agreement. Once this is shown, the Plaintiff must show that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that the objectives can be achieved in a substantially less restrictive manner. *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998). The object of the rule of reason inquiry is "to form a judgment about the competitive significance of the [challenged] restraint." *National Society of Profes-*

*sional · Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). With these requirements in mind, the Court proceeds to consider whether the Two in Four Rule violates § 1 of the Sherman Act.

### Does the Two in Four Rule have a Substantially Adverse Effect on Competition?

#### 1. The Relevant Market

■ In determining whether the Two in Four Rule has a substantially adverse effect on competition, the Court must first define the relevant product market. For antitrust purposes, the relevant product market is measured by "commodities reasonably interchangeable by consumers for the same purposes...." *United States v. E.I du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Thus, in order to ascertain the relevant product market, it is necessary to identify the products or services that are either identical to or are available substitutes for the products or services at issue. This analysis is characterized as the "reasonable interchangeability" standard. The Supreme Court observed in *du Pont* that reasonable interchangeability can be measured by product uses, *i.e.*, whether substitute products or services can perform the same function, and/or by consumer response (cross-elasticity), *i.e.*, consumer sensitivity to price levels at which they elect substitutes for the product or service at issue. *Id.* at 395–96, 76 S.Ct. 994.

16. The *per se* approach is applied "when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *NCAA v. Board of Regents*, 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The types of restraints

on trade that give rise to this analysis include price fixing, horizontal output restraints and market-allocation agreements. *Continental Airlines, Inc. v. United Airlines*, 277 F.3d 499, 509 (4th Cir.2002). The Supreme Court has cautioned against expanding this category. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

As to the issue of relevant submarket, the Sixth Circuit has explained that "a submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to the that test so as to more precisely define the market affected by the defendant's actions." *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). In other words, "a submarket is a market, ascertained by traditional market analysis, which includes additional, not wholly different considerations." *Id.*

In this case, Plaintiffs submit that the relevant product market includes all games played in Division I mens' college basketball. The Defendant agrees with this definition of the relevant market. Plaintiffs' expert, Dr. Tollison, further opines that the relevant submarket is comprised of "tournament games, both pre-season and post-season." In contrast, Defendant's expert, Mr. Guth defines the relevant submarket as school-scheduled games. According to Guth, because certified events are scheduled by the school, any other game that the school schedules upon being solicited, would be a close substitute for certified event games. As Guth testified, the structure of the NCAA Division I season results in schools having approximately eleven slots to fill each year through their own scheduling efforts. Thus, according to Guth, it makes sense to consider scheduled events as close substitutes rather than "tournament games" as Tollison opines.

As to the relevant market, this Court concludes that it is Division I mens' college basketball. To the extent consideration of a submarket is appropriate, the Court finds that it is comprised of school-scheduled games. In the Court's view, events that are scheduled by the schools themselves are close substitutes for each other. Furthermore, as stated *supra*, the Court finds Tollison's opinion as to the definition

of submarket unreliable for purposes of Rule 702.

The Court notes that, at the first hearing of this action, Tollison did not opine as to a relevant submarket. His opinion was rendered prior to the most recent hearing. Defendant has claimed unfair surprise as a result of Tollison's opinion. The Court finds Defendant's argument in this regard without merit for two reasons. First, Defendant's own expert, Louis Guth, opined as to a relevant submarket over one year ago when this matter came before the Court for the initial injunction hearing. Second, and more importantly, as the caselaw reveals, the submarket analysis "merely adds new factors to the test [for relevant market] so as to more precisely define the market affected by the defendant's actions." *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983). Thus, because the submarket analysis involves looking at additional and not wholly different considerations and because Defendant's own expert first opined on the theory, the Court cannot conclude that the Defendant is prejudiced by the Court's application of a submarket analysis. Moreover, as concluded above, the Court has rejected Tollison's definition of submarket and the Court has adopted Guth's definition.

With the relevant market and submarket defined, the Court now considers whether Plaintiffs have satisfied their initial burden of showing a substantial adverse effect on competition.

### 2. Effect on Competition

■ Ordinarily, the Plaintiff shows a substantial adverse effect on competition in the relevant market with evidence that the Defendant's role in the market is such that it impairs competition significantly. "However, if a Plaintiff can show 'that the

restraint has actually produced significant anti-competitive effects, such as a reduction in output,' a formal market analysis is unnecessary." *Metro Industries, Inc. v. Sammi Corp.*, 82 F.3d 839, 847–48 (9th Cir.1996), quoting *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir.1991). Under the rule of reason, Plaintiffs must show that a concerted attempt by Defendant to reduce output and drive up prices or otherwise reduce consumer welfare. *Consolidated Metal Products, Inc. v. American Petroleum Inst.*, 846 F.2d 284, 292–93 (5th Cir.1988). This requirement stems from the principle that the antitrust laws protect competition, not particular competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

At the time of the initial hearing on this case, the Court concluded that there was insufficient evidence to show whether the Two in Four Rule would have a substantially adverse effect in the market. The Court reached this conclusion because the effect of the rule on certified event tournaments in years three and four remained to be seen. As the Court stated, it could not "grant injunctive relief based on speculation as to the nature and extent of the purported injury or to the extent that competition may be diminished in years three and four of the rule." *(Opinion and Order*, 2002 WL 32137511, at *14). One year has now elapsed since the Court made this ruling and the Plaintiffs have come forward with evidence as to the effects of the rule in year three.

The evidence presented at the Permanent Injunction Hearing shows that the Two in Four Rule has indeed had an effect on the number of certified events played. It is undisputed that the number of certified events declined from 25 in the 2001–02 season, year two of the rule, to 17 in the 2002–03 season, year three of the rule. The number of actual games played in certified events decreased from 251 in the 2001–02 season to 144 in the 2002–03 season, for a loss of 107 games. In addition, the evidence adduced at the hearing shows that 11 certified events were canceled in the 2002–03 season and 5 events went forward with a reduced field, *i.e.*, fewer games and fewer teams participating. The evidence also shows that even fewer certified events will go forward in the upcoming year, which is year four of the rule.

In addition, and most importantly, it is undisputed that the decline in certified events is part of a decline in output of games in the submarket-school-scheduled games. The undisputed testimony demonstrated a net decline of 72 exempt games, which represents 3.3 % of all school-scheduled games. The evidence also reveals that the overall number of school-scheduled games declined by 4.15 %, or 85 games, from year two to year three of the challenged rule. Of the 85 game decline, 72 were represented by the net loss of exempt games. The Court bases these percentages on the total number of school-scheduled games equaling 1,962.

In 2001–02, there were a total of 2,047 school-scheduled games. (Defendant's Exhibit 586MM). At the hearing, Plaintiff's presented evidence that, in 2002–03, there were only 1,882 school-scheduled games. (Plaintiffs' Exhibit 279). Defendant challenges the accuracy of this number but nevertheless concedes that there was a decline. Following the hearing, Defendant filed a motion to exclude the Court's consideration of the 1,882 figure on the basis that it "simply takes Division I appearances against Division I opponents and divides by two ... ignor[ing] the hundreds of games played by # 130 at 1–2." The Defendant submits that the actual number of school-scheduled games in 2002–03 is 1,998. (Proffered Defendant Exhibit 586 LL). In response, Plaintiff states that it

accepts this figure but asserts that the number should be decreased by 36 in order to achieve the most accurate figure. According to Plaintiff, there were three new teams in Division I in 2002–03 which did not compete in Division I in 2001–2002. These three teams played a total of 70 school-scheduled games, two against non-Division I opponents. The addition of the new teams therefore added 36 school-scheduled games to the output in 2002–03.

In the interest of relying upon the most factually accurate data, the Court finds that 1,962 games were played in school-scheduled events in 2002–03. The Court notes that this figure represents a decline in actual number of games in the relevant submarket from the 2,047 number of the previous season.

Plaintiffs argue that the foregoing evidence is sufficient to satisfy their initial burden under the rule of reason analysis, *i.e.*, that the Two in Four Rule has a substantially adverse effect on competition. The Defendant contends that Plaintiffs have shown nothing more than an adverse impact on their own businesses. Defendant further contends that the lack of a cross-elasticity analysis in the relevant market is fatal to Plaintiffs' claims because without the study, the market is not sufficiently defined.

While it is true that, for purposes of an antitrust claim, the outer boundaries of the relevant market are defined by the reasonable interchangeability, or cross-elasticity, of the demand for the product and substitutes for it, *see e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3rd Cir.1997), it is undisputed that the relevant market in this case is Division I mens' college basketball together with the appropriate submarket consisting of school-scheduled games.

In light of the clear definitions in this case as to relevant market and submarket, the Court finds that the Plaintiffs' failure to perform cross-elasticity studies is not fatal to their antitrust claim. While such a study certainly may have been helpful to assess the effect on consumers of the decrease in output of certified events, the Court concludes that the undisputed decrease in output in the relevant submarket of school-scheduled events is sufficient to show that the Two in Four Rule has led to an adverse effect on competition. As noted *supra*, if the Plaintiffs show that the restraint at issue has actually produced significant anti-competitive effects, such as a reduction in output, "a formal market analysis becomes unnecessary." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir.1991).

The Defendant nonetheless contends that a reduction of 85 games in comparison to the approximate 5,000 Division I games played is not a substantial adverse effect. Initially, the Court notes that the relevant submarket is school-scheduled games, which, as described above, included 1,962 games played by Division I teams. The effect of the reduction is not insubstantial. It is undisputed that school-scheduled games, and certified events in particular, are very popular among fans of Division I mens' college basketball. The decline in the number of games in the submarket means the product is less available to meet consumer demand.

The effect in this case is similar to that addressed by the United States District Court for the Northern District of Illinois found in *Chicago Professional Sports Limited Partnership, et al. v. National Basketball Association*, 754 F.Supp. 1336 (N.D.Ill.1991). In that case, the owner of the Chicago Bulls, a professional basketball team, and WGN TV, a superstation that broadcasts professional basketball games from the Chicago area, sued the National Basketball Association ["NBA"] to enjoin its rule that each team could

broadcast no more than 20 games on a television "superstation [17]." The previous rule allowed up to 25 games to be broadcast on television superstations. The court found the 20 game rule to violate the rule of reason. The court stated:

> [A]dverse effects are directly observable.... The 5–game restriction demonstrably reduces the number of games available to viewers nationwide and the options open to advertisers for reaching those viewers, as well as the competition between teams and the league, and superstations and the networks in the national television market, and without evidence of any commensurate gains.... On the present evidence, the restraint imposed by the 5 game reduction suppresses competition without promoting it. It is therefore unlawful.

*Id.* at 1363–64.[18]

Similarly, in the case at bar, the Two in Four Rule has had the undisputed effect of reducing the number of games available to viewers and fans of Division I mens' basketball in the relevant submarket. While the Defendant argues that any loss is insubstantial, the Court disagrees and concludes that the reduction in output is sufficient to show an adverse effect for purposes of the rule of reason analysis. Plaintiffs have satisfied their initial burden.

### 3. Procompetitive Virtues of the Two in Four Rule

■ The second part of the rule of reason analysis requires that the Defendant come forward with evidence to show the procompetitive virtues of the Two in Four Rule. In this regard, the Defendant NCAA contends that the rule (1) furthers the goals of competitive equity between large and smaller schools, (2) furthers the goal of students avoiding missed class time, and (3) makes a more uniform season by stabilizing schedules and preventing an excessive number of games from being played.

---

**17.** A "superstation" was defined by the NBA as "any commercial over-the-air television station whose broadcast signal is received outside of the local Designated Market Area ('DMA'), as defined by A.C. Nielsen Co., by more than 5% of the total number of cable subscribers in the United States as reported by A.C. Nielsen...." *Chicago Professional Sports Limited Partnership v. NBA*, 754 F.Supp. 1336, 1345 (N.D.Ill.1991). Further, at the time of the decision, there were three superstations in the United States: WGN in Chicago, WTBS in Atlanta and WWOR in New York. All stations televised NBA games and WGN reached 31% of the nation's television households. *Id.* at 1345–46, 1348.

**18.** The Court notes that Plaintiffs rely on this case in their post-hearing brief. On July 14, 2003, Defendant filed a Motion Strike Plaintiffs' reliance on the case as inappropriate in light of the alleged "subsequent reversal and vacation of the injunction by the Seventh Circuit in *Chicago Professional Sports, Ltd. v. National Basketball Association*, 95 F.3d 593 (7th Cir.1996)." The NCAA's characterization of the subsequent history of the district court's underlying decision is inaccurate. The 1991 decision by the United States District Court for the Northern District of Illinois was affirmed by the Seventh Circuit in *Chicago Professional Sports, Ltd. v. NBA*, 961 F.2d 667 (7th Cir.1992). The Seventh Circuit denied a rehearing *en banc* in June 1992. Thus, pursuant to the decisions, the Chicago Bulls and the WGN Superstation were permitted to broadcast 25 games per year. The district court in Illinois later considered whether the number could be increased to 30 games per year and whether the NBA could impose a "tax" on the games' broadcast to a national audience. The district court held that a thirty game allowance was permissible but found the NBA's tax excessive. *Chicago Professional Sports Ltd. v. NBA*, 874 F.Supp. 844 (N.D.Ill.1995). This decision was vacated by the Seventh Circuit and the case was remanded for further proceedings, *Chicago Professional Sports, Ltd. v. National Basketball Association*, 95 F.3d 593 (7th Cir.1996). Thus, it is wholly inaccurate to characterize the holding of the district court in 1991 as being reversed and vacated. The Defendant's Motion to Strike (Doc. # 139) is DENIED.

The NCAA argues that its enactment of the Two in Four Rule falls within its authority as standard-setter for collegiate athletic sports. The NCAA points out that it has long been responsible for setting limits as to season length, the number of games and the duration of practices in all the sports which it oversees. Further, the NCAA argues that the limits that it establishes are necessary for the product of mens' college basketball to be available at all.

The NCAA's characterization of its role in college sports is indeed important. As the Supreme Court observed in *NCAA v. Board of Regents*, 468 U.S. 85, 88, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), "[s]ince its inception in 1905, the NCAA has played an important role in the regulation of amateur collegiate sports." The NCAA "has adopted and promulgated playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of athletes, and rules governing the size of athletic squads and coaching staffs." *Id.* Further, while the rules enacted by the NCAA may limit output in the relevant market, as the Supreme Court observed in the *Board of Regents* case, "what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 101, 104 S.Ct. 2948. Thus, "the NCAA's motives must be accorded a respectful presumption of validity, [but] it is nevertheless well-settled that good motives will not validate an otherwise anticompetitive practice." *Id.,* n. 23, 104 S.Ct. 2948 (citations omitted).

The Court finds this observation particularly applicable to this case. In the Court's view, the justifications offered by the NCAA in support of the Two in Four Rule are insufficient to insulate it from antitrust liability. The Court is cognizant of the fact the NCAA occupies the unique position of standard-setter in the market of Division I mens' basketball. Nevertheless, this role does not allow the NCAA to act in a manner that restrains competition in a manner that is anti-competitive, unless the NCAA can demonstrate an offsetting beneficial effect. As stated above, the Court finds that the Two in Four Rule has had a substantial adverse effect on competition. Moreover, as described *infra,* the Court finds that the goals proffered by the NCAA in support of the rule fail to justify the adverse effect.

As to the goal of competitive equity, the evidence adduced at the hearing shows that fewer teams will be able to participate in certified events because there are fewer events that will go forward. More importantly, the teams which the NCAA claims it intended to benefit-the lesser known, non-power conference teams—played in substantially fewer exempt games in 2002–03 than in the previous years. In addition, it is undisputed that certified event promoters, such as Plaintiffs, have had greater difficulty securing teams to play in certified events because of the reduction in eligibility caused by the rule. In view of this evidence, the goal of competitive equity is hardly being achieved.

The NCAA also contends that the rule is necessary to maintain the welfare of the student athlete. Because certified events are most often played during times when the student-athletes are on scheduled school breaks, for the Thanksgiving and Christmas holidays, the goal of promotion of student-athlete welfare has little, if any, effect. In the Court's view, if the NCAA truly had the best interests of athletes as students in mind, it would limit the number of games being played while school is in session, such as during the well-known NCAA tournament, which takes place during the spring college semester. The Two in Four Rule only affects, at most 5% of the total games played by Division I

teams. If student welfare were the justification, to be effective, the rule would certainly have to regulate the other 95 % of games played.

Further, the Court notes that at the same time as the passage of the Two in Four Rule, the NCAA actually *raised* the number of games, from 27 to 28, which a team may play each season. Thus, the total number of games played in Division I has increased as follows:

| Season | Division I Games |
|--------|------------------|
| 1999–2000: | 4,911 |
| 2000–2001: | 4,930 |
| 2001–2002: | 5,043 |
| 2002–2003: | 4,974 |

(Defendant's Exhibit 586 LL–1).

The total number of games played per year in each of the three years following the adoption of 98–92 is *greater* than the total in the year preceding the implementation of the rule. What these numbers show is that after the enactment of the Two in Four Rule the *total* number of games played by Division I teams actually *increased* while the number of games played within the submarket of school-scheduled games *decreased* and the number of exempt games plummeted. It is disingenuous for the NCAA to claim that the Two in Four Rule, which has reduced the number of exempt games, was intended to promote student welfare by limiting the number of games, while *simultaneously* increasing the overall number of games each team may play. Thus, even if this Court were to consider the effect of the 28th game on Plaintiffs' claim, the result would remain unchanged. The NCAA's attempt to justify this anticompetitive restraint in the name of student-athlete welfare is not credible.

Finally, the Court finds that the Two in Four Rule has done virtually nothing to achieve a standardized playing season, the third goal proffered by the NCAA in support of the rule. The rule does not require that exempt tournaments be played in certain months, nor does the rule limit the exempt tournaments to dates not in conflict with class schedules. The rule does not equalize the number of games each team ultimately plays, since it excludes conference tournaments and the NCAA tournament, which alone may include up to six extra non-counting games for the winning team.

In sum, the Court finds that the justifications offered by the NCAA in support of the Two in Four Rule fail to satisfy their burden under the Rule of Reason analysis of overcoming the anticompetitive effects of the rule.

### 4. Less Restrictive Alternatives

If the Defendant is successful in offering procompetitive virtues of an otherwise anticompetitive restraint, the third prong of the rule of reason analysis requires consideration of less restrictive alternatives to the restraint. The Plaintiff bears the burden on this issue of establishing that the rule is not reasonably necessary to achieve the legitimate objectives of the restraint or, that the objectives offered could be achieved in a substantially less restrictive manner. *See Law v. NCAA,* 134 F.3d 1010, 1019 (10th Cir.1998).

Since the Court concludes that the Two in Four Rule has a substantial anticompetitive effect in the submarket of school-scheduled games and, since the Court concludes that the allegedly procompetitive justifications offered by the NCAA fail to overcome the anticompetitive effects, the Court need not consider whether there are less restrictive alternatives to the Two in Four Rule.

### VI.

For the reasons stated above, this Court concludes that the Two in Four Rule enacted by the NCAA has a substantially adverse effect on competition and amounts

to a violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The NCAA is hereby **PERMANENTLY ENJOINED** from enforcing the Two in Four Rule. Plaintiffs' request for Permanent Injunction is **GRANTED.**

**IT IS SO ORDERED.**