**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VIRGINIA VERMICULITE, LIMITED,
Plaintiff-Appellant,

and

M.F. PEERS, JR.; NORMA PEERS,
Plaintiffs,                                              No. 97-1698

v.

W.R. GRACE & COMPANY -
CONNECTICUT,
Defendant-Appellee.

M.F. PEERS, JR.; NORMA PEERS;
VIRGINIA VERMICULITE, LIMITED,
Plaintiffs-Appellants,

v.                                                      No. 97-1699

W.R. GRACE & COMPANY -
CONNECTICUT,
Defendant-Appellee.

VIRGINIA VERMICULITE, LIMITED,
Plaintiff-Appellant,

v.

W.R. GRACE & COMPANY -
CONNECTICUT; THE HISTORIC GREEN

No. 97-1807

SPRINGS, INCORPORATED,
Defendants-Appellees.

NATIONAL TRUST FOR HISTORIC
PRESERVATION; THE LAND TRUST
ALLIANCE,
Amici Curiae.

Appeals from the United States District Court
for the Western District of Virginia, at Charlottesville.
James H. Michael, Senior District Judge.
(CA-96-12-3-C, CA-96-13-3-C, CA-95-15-3-C)

Argued: December 4, 1997

Decided: September 1, 1998

Before LUTTIG and WILLIAMS, Circuit Judges, and
MERHIGE, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.*

_____

Reversed and remanded by published opinion. Judge Luttig wrote the
opinion, in which Judge Williams joined.

_____

*Senior Judge Merhige participated in the hearing of this case at oral
argument but retired before the decision was filed. The decision is filed
by a quorum of the panel. See 42 U.S.C.§ 46(a).

2

**COUNSEL**

**ARGUED:** Einer Richard Elhauge, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellants. Charles Hubert Montange, Seattle, Washington; Randolph S. Sherman, KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, New York, New York, for Appellees. **ON BRIEF:** David Z. Izakowitz, Jane Champion Clarke, WOODS, ROGERS & HAZLEGROVE, P.L.C., Charlottesville, Virginia, for Appellant Virginia Vermiculite; Roger S. Martin, MARTIN & WOODARD, P.L.C., Charlottesville, Virginia, for Appellants Peers. David S. Copeland, KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, New York, New York; Thomas E. Albro, Patricia D. McGraw, TREMBLAY & SMITH, Charlottesville, Virginia, for Appellee W.R. Grace.

_____

**OPINION**

LUTTIG, Circuit Judge:

Plaintiffs Virginia Vermiculite, Limited and M.F. Peers, Jr. and Norma Peers appeal from the district court's dismissal of their claims against defendants W.R. Grace & Company and Historic Green Springs, Incorporated, brought under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Virginia law. Reviewing the district court's dismissal de novo, Chisolm v. TranSouth Financial Corp., 95 F.3d 331, 334 (4th Cir. 1996), we reverse.

I.

Appellant Virginia Vermiculite, Limited ("VVL") and appellee W.R. Grace & Company ("Grace") are the only domestic producers of vermiculite, a unique mineral used in fire safety, energy conservation, construction, environmental protection, food processing, and horticulture. Appellee Historic Green Springs, Incorporated ("HGSI") is a nonprofit organization that seeks to protect the Green Springs National Historic Landmark District in western Virginia. For approximately twenty years, HGSI has conducted a campaign to prevent vermiculite mining in the Green Springs region. Appellants Peerses are

3

family members who sold land containing vermiculite deposits to Grace, subject to royalty agreements.

Vermiculite is a relatively rare mineral. Only two states, South Carolina and Virginia, have known and usable vermiculite reserves. Grace mines vermiculite only in South Carolina; VVL, only in Virginia. Until 1976, Grace was the sole producer of vermiculite in the United States. From 1972 to 1976, Grace purchased mining rights to over 80% of the known vermiculite deposits in Virginia. Grace acquired some of this land from members of the Peers family, including appellants Peerses, in return for a lump sum and royalties on any vermiculite mined from the land. In exchange for these royalties, the Peerses agreed in writing that Grace, and its successors in interest, would retain "sole discretion" over whether to mine the land. Grace, however, never mined any of its Virginia deposits and consequently did not pay the Peerses any royalties.

In 1976, VVL entered the vermiculite market by obtaining rights to one of the few Virginia deposits not already held by Grace. By the early 1990s, VVL's share of the domestic vermiculite market had grown to approximately 23%. Grace, however, owned more than 80% of the mining rights to known vermiculite deposits in the United States, while VVL was rapidly depleting the deposits to which it had access.

In 1991, Grace invited VVL to make an offer to purchase Grace's vermiculite holdings in Virginia. VVL duly made an offer, which was rejected by Grace. Grace thereafter donated its holdings to HGSI. These holdings, comprising over 40% of the known vermiculite deposits in the United States, covered almost 1400 acres of land located in and around the Green Springs region. VVL alleges that the purpose of the donation was to prevent VVL from obtaining access to the vermiculite deposits on the land.

Grace made its donation in two parts. In 1992, Grace conveyed 1152 acres to HGSI, accompanied with restrictive covenants barring vermiculite mining on the land. Although the covenants bound HGSI and its successors in interest, Grace retained the right to waive them. However, a Virginia court subsequently struck down one of these covenants. See HGSI v. Brandy Farm, Ltd. , 32 Va. Cir. 98, 102-03

4

(Louisa Cty. 1993), petition refused, No. CH-4872 (Va. June 20, 1994). Consequently, when Grace transferred the final 229 acres to HGSI in 1994, it omitted any similar covenants. VVL alleges, however, that Grace executed this second part of the donation on the unwritten understanding that HGSI would not allow vermiculite mining on the land.

As a result of this donation, on February 21, 1995, VVL brought suit against Grace and HGSI ("the VVL suit"). VVL's complaint included six counts. Count I alleged that Grace and HGSI entered into an agreement, combination, or conspiracy in restraint of trade in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Count II alleged that Grace engaged in monopolization in violation of section 2 of the Sherman Act, id. § 2. Count III alleged that Grace attempted to engage in monopolization, also in violation of section 2. Count IV alleged that Grace and HGSI entered into a conspiracy to monopolize, again in violation of section 2. Count V alleged that Grace and HGSI violated analogous provisions of the Virginia Antitrust Act, Va. Code §§ 59.1-9.1 to 59.1-9.18. Count VI alleged that Grace and HGSI engaged in a conspiracy to injure another in trade, business, or profession, in violation of Virginia law, id. § 18.2-499.

On March 12, 1996, VVL, which had obtained interests in the claims of various members of the Peers family, and appellants Peerses brought two additional lawsuits against Grace ("the Peers suits"). The two suits included essentially identical counts. Counts I to V alleged that Grace's donation of the land sold to it by the Peerses violated various state laws. Count VI alleged that the donation violated section 1 of the Sherman Act.

The district court referred all of these suits to a magistrate judge, and, on September 19, 1995, the magistrate recommended dismissing Counts I, II, and III of the VVL suit for failure to state a claim, Fed. R. Civ. P. 12(b)(6), and dismissing Counts V and VI for want of jurisdiction, 28 U.S.C. § 1367(c). On September 19, 1996, the magistrate recommended dismissing the Peers suits in their entirety on similar grounds.

The district court adopted the magistrate's recommendations in part. 965 F. Supp. 802 (W.D. Va. 1997). First, the district court con-

5

cluded that VVL and the Peerses had failed to state a claim for an agreement, combination, or conspiracy in restraint of trade under section 1 of the Sherman Act. Id. at 819-21. Consequently, it dismissed Count I of the VVL suit, Count V of the same suit to the extent that it relied on the same theory, and Count VI of the Peers suits. Id. at 821. Second, the district court held that HGSI was entitled to an exemption from the antitrust laws. Id. at 813. It thus dismissed HGSI from the VVL suit entirely. Id. at 818. Third, the district court concluded that VVL and the Peerses had failed to state a claim under Virginia law in the Peers suits. Id. at 829-32. Therefore, it dismissed the remainder of those suits. Id. VVL and the Peerses subsequently brought this consolidated appeal, challenging all three rulings.

II.

Appellants first assert that the district court erred in finding that they failed to state a claim under section 1 of the Sherman Act. We agree.

The district court dismissed appellants' section 1 claims on the ground that appellants failed to demonstrate a sufficient causal relationship between their alleged injury and appellees' alleged violation of the antitrust laws. 965 F. Supp. at 819. Specifically, the court reasoned that any injury to appellants was unavoidable because HGSI, or its successors in interest, would not have allowed vermiculite mining on the donated lands even absent the nonmining agreements between HGSI and Grace. Id. at 820. This reasoning is faulty for two reasons.

First, appellants sufficiently alleged that HGSI, or its successors in interest, might eventually have allowed vermiculite mining on the donated lands in the absence of the nonmining agreements. In this regard, of course, appellants need only make a "colorable" showing that it was "reasonably probable" that the behavior in question caused their injury. Advanced Health-Care Servs., Inc. v. Radford Community Hosp., 910 F.2d 139, 149 (4th Cir. 1990). Such a low standard is particularly justified in this context because "in antitrust cases, where `the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hospital Bldg. Co. v. Trustees

6

of the Rex Hosp., 425 U.S. 738, 746 (1976) (quoting Poller v. CBS, 368 U.S. 464, 473 (1962)) (citation omitted).

Appellants meet this standard. VVL acknowledged in its complaint that eliminating vermiculite mining was "one of HGSI's avowed goals." J.A. at 575. It also claimed, however, both that HGSI had other goals and that its management and members had financial interests of their own in the land in question. Id . By alleging that HGSI had goals beyond eliminating vermiculite mining and that its management and members individually had financial interests in the land in question, appellants sufficiently raised the specter either of possible mining by HGSI or its agents or of sale of the land to another for mining. As appellants observe, it is not at all implausible that HGSI might have chosen to mine the reserves in order to pursue other of its goals or even to preserve its financial stability. Indeed, appellants represent that HGSI has already sold some of the land. See Br. of Appellants at 40. The fact that the parties saw the need to enter into the nonmining agreements at all yet further supports the inference that HGSI had other goals beyond preservation, as the nonmining agreements would have been superfluous to the donation were HGSI committed solely to the elimination of mining.

Second, the district court simply misconstrued the nature of appellants' section 1 allegations. Rather than asserting that the nonmining agreements alone constituted an agreement, combination, or conspiracy in violation of section 1, both VVL and the Peerses alleged that the entire transaction between Grace and HGSI -- comprising both the donation of the lands and the nonmining agreements -- constituted such an agreement, combination, or conspiracy. See J.A. at 575-76 (VVL complaint); id. at 129, 141 (Peers complaints). Consequently, the relevant question for causal purposes is not whether HGSI would have allowed mining in the absence of the nonmining agreements, but rather whether Grace would have allowed mining in the absence of both the donation and the nonmining agreements. Absent its transaction with HGSI, Grace may even have been required to grant VVL access to its Virginia holdings, on the ground that failure to do so would constitute an improper unilateral refusal to deal. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 483 n.32 (1992). Further, even if Grace lawfully could have

7

donated the lands to HGSI without the nonmining agreements, it is foreclosed from challenging causation simply on the basis that it could have achieved the same result through lawful means. See Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1302 (4th Cir. 1979) (holding that, when an antitrust plaintiff alleged damages resulting from the defendant's concerted refusal to deal,"the fact that [the defendant] might have caused the same damages by a lawful [unilateral] cancellation of the contract is irrelevant"). For these reasons, the district court erred in dismissing appellants' section 1 claims.**1**

III.

Appellants next argue that the district court erred in dismissing their claims against HGSI. We agree.

The district court dismissed appellants' claims against HGSI on the ground that HGSI is exempt from the antitrust laws because it is a nonprofit organization pursuing noncommercial, sociopolitical objectives. 965 F. Supp. at 815. We hold that, regardless of whether an "exemption" for nonprofit organizations exists, HGSI does not qualify for such an exemption here because the transaction between HGSI and Grace was fundamentally commercial.

Section 1 of the Sherman Act includes no reference to an exemption for nonprofit organizations, stating instead that "[e]very person" who acts in restraint of trade or commerce falls within its scope. 15 U.S.C. § 1. In interpreting section 1, the Supreme Court has repeatedly confirmed that nonprofit organizations are not exempt from the section's reach. See NCAA v. Board of Regents, 468 U.S. 85, 100 n.22 (1984) ("There is no doubt that the sweeping language of § 1 applies

_____

**1** Grace argues that the Peerses lack standing to assert antitrust claims against it. Whether the Peerses have antitrust standing turns primarily on whether their injuries are direct or indirect, an inquiry that in turn depends on whether other, more directly affected parties exist. See, e.g., Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 541-42 (1983); Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-31 (1977). Because the Peerses directly supplied mining rights to Grace, with no intervening party more directly implicated, we hold that they do have standing.

8

to nonprofit entities, and in the past we have imposed antitrust liability on nonprofit entities which have engaged in anticompetitive conduct." (citations omitted)); American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 576 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws."); Goldfarb v. Virginia State Bar, 421 U.S. 773, 786-87 (1975) ("We cannot find support for the proposition that Congress intended any such sweeping exclusion.").

A number of our sister circuits have held that, in certain circumstances, nonprofit organizations are not subject to antitrust liability. See, e.g., Dedication and Everlasting Love to Animals v. Humane Soc'y, 50 F.3d 710, 712 (9th Cir. 1995) (refusing to apply antitrust laws to solicitation of contributions by charity); Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Sch., Inc., 432 F.2d 650, 654-55 (D.C. Cir. 1970) (likewise for accreditation of educational institution by regional association). When these cases are examined closely, however, this seeming "exemption" is not really an exemption at all, but a straightforward interpretation of the plain language of section 1, which prohibits only restraints of "trade or commerce," not noncommercial behavior. See, e.g., United States v. Brown Univ., 5 F.3d 658, 666 (3d Cir. 1993) (applying antitrust laws to nonprofit universities on the ground that payment of tuition in return for education constitutes "quintessential commercial transaction," with classification of transaction as commercial based on "totality of surrounding circumstances"); cf. NOW v. Scheidler, 968 F.2d 612, 622-23 (7th Cir. 1992) (refusing to apply antitrust laws to abortion protests even though defendants were not nonprofit organizations, on ground that behavior was noncommercial).

Regardless of how the "exemption" for nonprofit organizations engaging in noncommercial behavior is characterized, however, HGSI is subject to the antitrust laws in this case because the transaction between HGSI and Grace was essentially commercial. We emphasize that the dispositive inquiry is whether the transaction is commercial, not whether the entity engaging in the transaction is commercial. Ample evidence suggests the commercial nature of the transaction here. First, as the district court recognized, the transaction between HGSI and Grace had obvious effects on the commercial market for vermiculite: by constraining the supply of vermiculite, the

9

transaction increased the price of the mineral. 965 F. Supp. at 815. Further, as the district court also acknowledged, the transaction had direct commercial benefits for HGSI itself: by receiving hundreds of acres of land, HGSI not only realized a substantial"pecuniary gain," id. at 809, but also protected the alleged commercial interests of its management and members, which might be affected by mining of the land, J.A. at 575.

Even were we to hold that HGSI was somehow "exempt" from the antitrust laws by virtue of being a nonprofit organization, the Supreme Court has held, in the context of other exemptions, that an organization that would otherwise be exempt from the antitrust laws loses its exemption by conspiring with a nonexempt party. See Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 809-10 (1945) (labor exemption); United States v. Borden Co., 308 U.S. 188, 204-05 (1939) (agriculture exemption). Moreover, it is not necessary that HGSI have shared Grace's alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects. See Hydrolevel, 456 U.S. at 573-74 (holding nonprofit organization liable regardless of whether its agents acted with intent to benefit organization, provided restraint had anticompetitive effects); United States v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948) ("[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."); Duplan Corp. v. Deering Milliken Inc., 594 F.2d 979, 982 (4th Cir. 1979) (per curiam) ("Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial."). In assessing whether HGSI is subject to the antitrust laws for its participation in the transaction with Grace, the only relevant inquiry is into the nature of the transaction, not the nature of HGSI's motive. Because the transaction at issue in this case was fundamentally commercial, the district court erred in dismissing HGSI as a defendant.**2**

_____

**2** In its brief, see Br. of Appellee HGSI at 23-25, HGSI makes the related, but discrete, argument that it should be immune from antitrust liability because its conduct in entering into the transaction with Grace

IV.

Finally, appellants argue that the district court erred in finding that they failed to state a claim under Virginia state law in the Peers suits. Again, we agree.

The district court rested its dismissal of appellants' state law claims primarily on its interpretation of the provision in the contract between the Peerses and Grace that vested Grace with "sole discretion" to decide whether to mine the land. 965 F. Supp. at 831-32. It ruled that Grace had no implicit contractual duty under state law to use good faith in exercising its discretion as to whether to mine. Id. at 831. Not only was this ruling incorrect as a matter of standard contract law, but it also failed to take into consideration a prior Virginia case ruling on a virtually identical contract.

First, it is a basic principle of contract law in Virginia, as else-where, that although the duty of good faith does not prevent a party from exercising its explicit contractual rights , a party may not exer-cise contractual discretion in bad faith, even when such discretion is vested solely in that party. See Steven J. Burton & Eric G. Anderson, Contractual Good Faith 46-47 (1995) ("The courts could leave all discretion in performance unbridled. . . . No U.S. court now takes this approach . . . . Thus, contractual discretion is presumptively bridled by the law of contracts -- by the covenant of good faith implied in every contract."). Neither of the cases on which the district court relied is inconsistent with this rule. See Charles E. Brauer Co. v. NationsBank, 251 Va. 28, 35 (1996) (holding that exercise of explicit

_____

was protected by the First Amendment, see NAACP  v. Claiborne Hard-ware Co., 458 U.S. 886, 907-15 (1982) (holding that politically moti-vated boycott was not subject to antitrust laws). We reject this argument for two reasons. First, HGSI simply does not identify any "speech" that would be restricted if HGSI were subject to the antitrust laws. Second, the Supreme Court has since limited its reasoning in Claiborne to cases in which the defendant is financially disinterested. See FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 425-28 (1990). As we noted above, see supra Part II, appellants have sufficiently alleged that HGSI was financially interested in the transaction with Grace.

11

contractual right by bank against debtor was not bounded by good faith); Mahoney v. NationsBank, 249 Va. 216, 219-21 (1995) (same).

Second, the Virginia courts have already ruled, in earlier litigation involving a conveyance of vermiculite mining rights to Grace and a donation of those rights from Grace to HGSI, that a nearly identical contractual provision carries with it an implicit duty of good faith. Brandy, 32 Va. Cir. at 102. In Brandy, as here, a private landowner conveyed mining rights to Grace in return for a lump sum and royalty payments.**3** Id. at 98-99. The landowner, again as here, agreed in writing that Grace would retain "sole discretion" over whether to mine the property. Id. at 101. The court in Brandy concluded that such a provision entailed an implicit duty of good faith. Id . at 102 ("[T]he implied duty of good faith is particularly important in the context of mining leases, where the landowners must necessarily leave the decision-making process to the expertise of mining companies."). Moreover, the court held that Grace's donation of the rights at issue to HGSI constituted a breach of that duty. Id. at 102-03.

In predicting how the Virginia courts would construe this contractual provision, we refuse to presume either that they would deviate from a fundamental premise of contract law or that they would change their minds so soon after interpreting a nearly identical provision in a nearly identical context. Accordingly, we hold that the district court erred in dismissing appellants' state law claims.**4**

_____

**3** Grace argues that Brandy should be distinguished because the transaction at issue involved a lease, rather than a sale, of land. See Br. of Appellee Grace at 21. We find this distinction unpersuasive. Indeed, the argument for implying a duty of good faith may even be stronger in the latter case, because the original landowner in the former case could at least choose not to renew the lease were it unsatisfied with how Grace had exercised its discretion.

**4** Because we hold that appellants have sufficiently alleged that Grace breached its implicit contractual duty to act in good faith, we express no view on appellants' theory that Grace also violated the explicit terms of the contract by entering into the nonmining agreements with HGSI. See Br. of Appellants at 30-31.

12

CONCLUSION

The judgment of the district court is reversed, and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

13