*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0395p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WORLDWIDE BASKETBALL AND SPORT TOURS, INC., et al.,

               *Plaintiffs-Appellees,*

    *v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

               *Defendant-Appellant.*

No. 03-4024

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01439—Edmund A. Sargus, Jr., District Judge.

Argued: February 3, 2004

Decided and Filed: November 15, 2004

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Gregory L. Curtner, MILLER, CANFIELD, PADDOCK & STONE, Ann Arbor, Michigan, for Appellant. W. B. Markovits, MARKOVITS & GREIWE, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Gregory L. Curtner, MILLER, CANFIELD, PADDOCK & STONE, Ann Arbor, Michigan, James A. Wilson, Laura G. Kuykendall, VORYS, SATER, SEYMOUR & PEASE, Columbus, Ohio, for Appellant. W. B. Markovits, MARKOVITS & GREIWE, Cincinnati, Ohio, Stanley M. Chesley, WAITE, SCHNEIDER, BAYLESS & CHESLEY, Cincinnati, Ohio, for Appellees.

    BATCHELDER, J., delivered the opinion of the court, in which COOK, J., joined. GIBBONS, J. (pp. 8-10), delivered a separate concurring opinion.

---

**OPINION**

---

    ALICE M. BATCHELDER, Circuit Judge. The National Collegiate Athletic Association, (the "NCAA"), appeals the district court's order declaring that the NCAA's "Two in Four Rule" violates Section I of the Sherman Antitrust Act, 15 U.S.C. § 1, and permanently enjoining the enforcement of that rule. Because we conclude that the district court erred in applying an abbreviated or "quick-look" analysis and in its definition of the market for purposes of antitrust analysis, and because the record does not contain evidence to support a proper market definition, we REVERSE the judgment of the district court.

1

## I.

The NCAA is a voluntary organization of over 1200 colleges and universities that promulgates rules and regulations designed to, in its own words, "maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body." To accomplish this goal, the NCAA adopts bylaws formulated by a legislative body drawn from the Association's membership. The NCAA members agree to follow those by-laws. Of concern in this case is a portion of the NCAA Division I men's basketball regulations, specifically because of a restriction on the type and number of games individual schools are permitted to play.

Men's Division I basketball is divided into conferences; within each conference the member schools individually play each other. Each school, however, makes its own schedule and may seek several non-conference games. The NCAA sets the maximum number of games that each team may play per year. Throughout the year, there are various tournaments in which a school's team may participate, some of which are "certified" and some of which are not. Certified tournament events are multiple-game early season tournaments. These events were originally introduced as a means of encouraging scheduled games with schools in Alaska and Hawaii that traditionally had difficulty scheduling games because of their inconvenient locations. In recent years, the NCAA has become concerned that the more "powerful" basketball schools (i.e., members of the "Big Six" conferences) were disproportionately taking advantage of the certified events. To address this concern, the NCAA adopted Proposal 98-92 ("98-92"), which increases to 28 the number of allowed games per season for each team, provides that a team's participation in a certified event, regardless of how many games the team actually plays as part of that event, counts as one game toward the NCAA regular season maximum, and permits each team to participate in "not more than one certified basketball event in one academic year, and not more than two certified basketball events every four years." As stated in the text of 98-92, the rationale of the rule is to:

> address competitive equity concerns by giving many Division I institutions an opportunity to compete in certified events, particularly those outside the continental United States, so that the inherent recruiting and competitive advantages are distributed equally among Division I institutions. This proposal will provide Division I men's and women's basketball programs greater flexibility in the scheduling of basketball contests. It will permit institutions the opportunity to participate in certified contests in accordance with the legislation or to add additional contests to the institution's regular-season schedules during those years in which the institution either is not permitted to engage in a certified contest or chooses not to participate in such an event.

The plaintiffs in this case are promoters of outside certified tournament events (the "Promoters"). They allege that the NCAA is less concerned with the disproportionate advantage to the Big Six Conferences than it is with the monies that the outside promoters of certified events are able to make in connection with these events. The Promoters contend that the Two in Four Rule, the prong of 98-92 that limits teams to two certified events every four years, was adopted purely to deny outside promoters the opportunity to make money from the certified events.

Complaining that the application of this rule limited their ability to schedule events with schools having the most powerful and famous basketball programs, which in turn hampered their ability to sell tickets and make broadcast contracts, the Promoters initiated this suit on December 21, 2000, alleging that the Two in Four rule is a violation of the Sherman Antitrust Act. On August 6, 2001, they filed a motion for preliminary injunction under § 16 of the Clayton Act; that motion was then consolidated with a motion for permanent injunction. The district court issued an Opinion and Order on July 19, 2002, holding that because the rule had not been in effect long enough to permit its effect to be accurately evaluated, the motion for preliminary injunction was denied and the motion for permanent injunction would be held in abeyance. The plaintiffs renewed their request for a permanent injunction on February 29, 2003, asserting that there was by then enough evidence to justify the injunction. The district court granted the permanent

injunction on July 28, 2003. *Worldwide Basketball and Sports Tours, Inc. v. NCAA*, 273 F. Supp. 2d 933, 954-55 (S.D. Ohio 2003). The NCAA timely appealed, and because of the nature of the injunction, the NCAA sought and obtained from this court a stay and order for expedited appeal.

## II.

Our standard of review for the granting or denial of a permanent injunction is mixed:

When reviewing the decision of a district court to grant or to deny a request for issuance of a permanent injunction, we employ several different standards of review. Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for an abuse of discretion.

*Secretary of Labor, U.S. Dept. of Labor v. 3RE.COM, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003) (citing *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local Union 2359*, 186 F.3d 733, 737 (6th Cir. 1999) (internal quotations omitted)).

Section One of the Sherman Act provides that:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1. By its plain language, this section applies to the Two in Four rule only if the rule is commercial in nature. The NCAA maintains that the rule is academically directed and motivated and its commercial impact is negligible. The Promoters and the district court, on the other hand, assume that the Two in Four rule involves a "restraint of trade or commerce." *Id.*

The dispositive inquiry in this regard is whether the rule itself is commercial, not whether the entity promulgating the rule is commercial. *See, e.g., Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Connecticut*, 156 F.3d 535, 540 (4th Cir. 1998). At least *some* NCAA rules have been held to be commercial and hence subject to antitrust scrutiny. *See NCAA v. Bd. of Regents of the University of Oklahoma*, 468 U.S. 85, 98 (1984) ("*Bd. of Regents*") (finding NCAA rules limiting live broadcasting of college football games subject to scrutiny under Sherman Act). One of our sister circuits has held that NCAA rules governing eligibility for participating in collegiate sports are not commercial, *see Smith v. NCAA*, 139 F.3d 180, 184-85 (3rd Cir. 1998), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999), but this circuit has not yet addressed the commercial or non-commercial nature of particular NCAA rules.

We think it apparent that the Two in Four rule has some commercial impact insofar as it regulates games that constitute sources of revenue for both the member schools and the Promoters. We therefore assume that the district court's implicit finding that the Two in Four rule is commercial is supported by the evidence and we proceed on that basis.

In order to establish their claim under Section 1 of the Sherman Act, the Promoters must prove that the NCAA "(1) participated in an agreement that (2) unreasonably restrained trade in the relevant market." *Nat'l Hockey League Players' Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). The NCAA does not dispute the Promoters' claim that the Two in Four Rule represents an agreement in which the NCAA participated. The NCAA vigorously contests the district court's conclusion that the Two in Four agreement unreasonably restrains trade in the relevant market.

**A.**

Whether an agreement *unreasonably* restrains trade is determined under one of two approaches: the *per se* rule and the rule of reason. It is well-established that cases involving industries "in which horizontal restraints on competition are essential if the product is to be available at all" should be analyzed using the rule of reason. *See Bd. of Regents*, 468 U.S. at 100-01; *see also Nat'l Hockey League*, 325 F.3d at 719 (finding that the district court erred in failing to apply the rule of reason analysis to a challenge concerning hockey league eligibility rules). Because there is no doubt that horizontal restraints are necessary to make the kind of league competition at issue available, the rule of reason applies.

Under the rule of reason analysis, the plaintiff bears the burden of establishing that the conduct complained of "produces significant anticompetitive effects within the relevant product and geographic markets." *Nat'l Hockey League*, 325 F.3d at 718. If the plaintiff is able to meet that burden, the defendant must provide evidence to establish that the restraint complained of has procompetitive effects sufficient to justify the injury resulting from the anticompetitive effects of the restraint. *Id.* The plaintiff is then left to prove that the legitimate procompetitive objectives can be achieved in a substantially less restrictive manner. *Id.*

This court has held that "the determination of a relevant market is composed of the articulation of a *legal* test which is then applied to the *factual* circumstances of each case." *White & White, Inc. v. Amer. Hosp. Supply Corp.*, 723 F.2d 495, 499 (6th Cir. 1983) (citations omitted) (emphasis in original). Accordingly, while a district court's conclusion concerning what constitutes the relevant market is subject to the clearly erroneous standard of review, "the district court's formulation of the market tests may be freely reviewed on appeal as a matter of law[.]" *Id.* at 500.

When applying the rule of reason, the courts have occasionally applied what has come to be called an abbreviated or "quick-look" analysis. Accordingly, in analyzing a restriction on the number of NCAA football games which could be televised in *Bd. of Regents,* the Supreme Court held that a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." *Bd. of Regents*, 468 U.S. at 110. Similarly, in *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986), the Court found that "no elaborate industry analysis is required to demonstrate the anticompetitive character" of a horizontal agreement among dentists to withhold X-Rays from insurers for use in benefit determinations. *Id.* at 459 (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Recently, in *California Dental Assoc. v. FTC*, 526 U.S. 756 (1999), the Supreme Court granted certiorari to address when abbreviated or quick-look rule of reason is appropriate. *Id.* at 764-65. The Court reasoned that:

> there is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.

*Id.* at 780-81. In analyzing cases such as *Bd of Regents*, *Indiana Fed'n of Dentists*, and *Nat'l Soc. of Prof'l Eng'rs* in which an abbreviated or quick-look analysis was applied, the Court found that "[i]n each of these cases . . . an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Id.* at 770.

In its 2002 decision denying a preliminary injunction, the district court found application of the quick-look rule of reason inappropriate, stating that "[t]he two in four rule simply does not have the 'obvious anti-competitive effects' as the rule at issue in *Board of Regents* [did,] so as to dispense with the full rule of reason analysis." In its 2003 decision granting a preliminary injunction, the court again

suggested that it was applying the full rule of reason analysis. *See Worldwide Basketball & Sports Tours*, 273 F. Supp. 2d at 948. After accurately announcing the requirements of the full rule of reason, however, the district court stated that "if a Plaintiff can show that the restraint has actually produced significant anti-competitive effects, such as a reduction in output, a formal market analysis is unnecessary." *Id.* at 949-50 (quoting *Metro Industries, Inc. v. Sammi Corp.,* 82 F.3d 839, 847-48 (9th Cir. 1996) (quoting *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991)) (internal quotation marks omitted)). This is, in fact, an able exposition of the quick-look standard. Indeed, the authority ultimately quoted by the district court–the Ninth Circuit's opinion in *Bhan*–itself relies upon *Indiana Fed'n of Dentists*, which the Supreme Court referred to as forming the basis for the abbreviated or quick-look analysis. *See Bhan*, 929 F.2d at 1413 (citing *Indiana Fed'n of Dentists,* 476 U.S. at 460-61); *see also California Dental Assoc.*, 526 U.S. at 770 (characterizing *Indiana Fed'n of Dentists* as forming the basis for "quick look").

We believe that the district court was correct the first time: this is not a case which is suitable for quick-look analysis. Far from being a case in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on *customers* and *markets*," *id.* (emphasis added), here the relevant market is not readily apparent and the Plaintiffs have failed to adequately define a relevant market, thereby making it impossible to assess the effect of 98-92 on customers rather than merely on competitors. While it is true that "the rule of reason can sometimes be applied in the twinkling of an eye," *Bd. of Regents*, 468 U.S. at 109 n.39 (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37-38 (Federal Judicial Center, June 1981) (parenthetical omitted)), this abbreviated or "quick-look" analysis may only be done where the contours of the market and, where relevant, submarket, are sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition. Under the "quick-look" approach, extensive market and cross-elasticity analysis is not necessarily required, but where, as here, the precise product market is neither obvious nor undisputed, the failure to account for market alternatives and to analyze the dynamics of consumer choice simply will not suffice. The district court therefore erred in applying a quick-look analysis.

## B.

"In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce', monopolization of which may be illegal." *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 395 (1954). The "relevant market encompasses notions of geography as well as product use, quality, and description." *Nat'l Hockey League*, 325 F.3d at 719 (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (internal quotation marks omitted)). Relying on *du Pont*, this court has found the "reasonable interchangeability" standard to be the essential test for ascertaining the relevant product market test. *White & White, Inc.*, 723 F.2d at 500. Reasonable interchangeability "may be gauged by (1) the product uses, *i.e.*, whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id.* (citation omitted).

The Supreme Court has long recognized that within a product market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (citing *E. I. du Pont de Nemours & Co.*, 353 U.S. at 593-595). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

A submarket "merely provides several new factors, in addition to [the existing ones of] selling price, uses, and physical characteristics, which the court may use in determining interchangeability between

different products." *White & White, Inc.*, 723 F.2d at 500 (quotation, citation, and emphasis omitted). However, "a submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions." *Id.* The burden is on the antitrust plaintiff to define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur. *See Tanaka*, 252 F.3d at 1063. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Nat'l Hockey League*, 325 F.3d at 719-20 (quoting *Tanaka*, 252 F.3d at 1063 (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999))).

The district court found the relevant market in this case to be Division I mens' college basketball, and noted that both the Promoters and the NCAA agreed with this definition of the relevant market. *Worldwide*, 273 F. Supp. 2d at 949. Although the NCAA does not appear to have disputed the Promoters' view that the relevant market is Division I Men's Basketball as a whole, the basis for that view is not developed in the record. Indeed, the district court had no factual circumstances to which it could apply the legal test, since the Promoters presented no evidence of "products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service." *White and White*, 723 F.2d at 500. Dr. Tollison, the Promoters' expert witness, admitted that he did not look at those in competition with the Promoters (their "competitors"), the competitors' output, or their output relative to the Promoters. And he did no test to determine which events are in competition with others. Finally, Dr. Tollison, when pressed, admitted that his testimony regarding the Big Six market was instead derived from "common sense."

Furthermore, the district court concedes that Dr. Tollison "did not perform a study on the effect of the Two in Four Rule on consumers of Division I mens' games. According to Tollison, the loss of games necessarily constitutes a loss to consumers in the relevant market because college basketball events are not fungible." However products need not be fungible to be market competitors for the purposes of antitrust analysis. The Supreme Court has repeatedly held that "it is improper 'to require that products be fungible to be considered in the relevant market.'" *United States v. Continental Can Co.*, 378 U.S. 441, 449 (1964) (quoting *E. I. du Pont De Nemours & Co.*, 351 U.S. at 394). Rather than fungibility, the proper analysis "is an appraisal of the 'cross-elasticity' of demand in the trade." *E. I. du Pont De Nemours & Co.*, 351 U.S. at 394. Indeed, Dr. Tollison admitted that a cross-elasticity study is necessary to determine the relevant market, yet he concedes that he failed to perform such an analysis.

The district court, however, did not base its decision that the Two in Four Rule is anticompetitive simply on the Division I Mens' College Basketball market taken as a whole. Instead, the court held that "it is undisputed that the relevant market in this case is Division I mens' college basketball together with the appropriate submarket consisting of school-scheduled games," where school-scheduled games are defined as games that a team is not required to play but rather are selected by a school's scheduling coach. *Id.* at 951. Contrary to the district court's findings, however, the record suggests that the submarket is not undisputed.

Dr. Tollison did not testify that school-scheduled games are the relevant submarket, nor did he provide any basis for arriving at that conclusion. Rather, he opined that the relevant submarket is pre- and post-season tournaments, but because Tollison failed to provide any basis for that opinion, the district court correctly found it unreliable. Because the Promoters' failed to define the relevant market, and with it the submarket, the district court had ample basis to dismiss their claim. *See Nat'l Hockey League*, 325 F.3d at 719-20 (quoting *Tanaka*, 252 F.3d at 1063 (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999))). Instead, however, the district court relied on what it found to be the opinion of the defendant's expert, Mr. Guth–that the relevant submarket is school-scheduled games–an opinion with which the court said Dr. Tollison had agreed. However, it is less than clear that Mr. Guth defines school-scheduled games as the relevant submarket. Admittedly, there is some evidence in the record which would support this proposition. For example, Mr. Guth stated that "in my view, the relevant market appears to be overall men's Division I basketball, and in particular, where the close substitution takes place in school-scheduled games and not solely in terms of the impact on the plaintiff promoter group." He also produced

a report in which he stated that "the most important product, for purposes of this litigation, should be defined as school-scheduled games." At trial, however, when he was pointedly asked by counsel whether by this he was saying that the relevant market is school-scheduled games, Guth responded: "Neither in words nor in intent." Mr. Guth then clarified that while he believed that "the most important product, that is the close substitutes, in this litigation should be defined as school-scheduled games[,]" he nonetheless was "not saying that there is a school-scheduled game relevant market as that term is used by economists with antitrust matters." Given this record, it would be difficult to conclude that Mr. Guth named school-scheduled games as the relevant submarket. Accordingly, we decline to relieve the Promoters of their burden based on such a dubious stipulation by the defendant's expert.

Because the Promoters failed to define the relevant market within which the significance of the allegedly anti-competitive effects can be gauged, and the record is not sufficient to support the district court's holding with respect to the relevant market, the Promoters cannot prevail on their claim that the Two in Four Rule violates Section 1 of the Sherman Act. *Nat'l Hockey League*, 325 F.3d at 719-20. Accordingly, we need not reach the question of whether the NCAA's Two in Four rule is anticompetitive or satisfies the rule of reason test. Nor do we reach the question of whether the Promoters have suffered the antitrust injury requisite to a showing of standing, *see Phototron Corp. v. Eastman Kodak Co*., 842 F.2d 95, 99 (5th Cir. 1988); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."). Because the Promoters failed to meet their duty to define the relevant market and submarket, this court has insufficient information to reach the question of whether the Promoters suffered an antitrust injury–that is, an injury resulting from interference with "the economic freedom of participants in the *relevant market*." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) (citing *United States v. Topco Assoc.*, 405 U.S. 596, 610 (1972)) (emphasis added).

## CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court.

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring.  I concur in the decision to reverse the judgment of the district court, but I would decide this case based on the plaintiffs' failure to establish that they have suffered an antitrust injury.  Antitrust standing is a threshold matter that should be addressed before proceeding to other issues presented by an antitrust claim.  In *HyPoint Technology, Inc. v. Hewlett-Packard Co.*, this court reasoned that, in view of the Supreme Court's articulation of the antitrust laws in numerous cases,

> it is appropriate to turn first to the issue of antitrust standing before weighing the issues of relevant market, market share, etc.  In other words, before discussing the claims made in this case regarding relevant market and market power, we must determine if HyPoint has antitrust standing to assert claims under the Supreme Court's precedents.

949 F.2d 874, 876-77 (6th Cir. 1991).  *See also Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) (finding no error in the district court's decision to dismiss claims because the plaintiff failed to meet its "standing threshold"); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1146 (6th Cir. 1975) (noting that the district "court subsequently certified for appeal the *threshold* question of the standing of these investment firms to sue" under antitrust law) (emphasis added); *Campus Ctr. Disc. Den, Inc. v. Miami Univ.*, 114 F.3d 1186, 1997 WL 271742, at *1 (6th Cir. May 21, 1997) ("As a threshold matter, proper assertion of an antitrust violation requires the demonstration of an antitrust injury.").

Here, in my view, it is unnecessary to consider whether the plaintiff promoters have met their burden of proving that a relevant market exists for Division I men's college basketball games.  Assuming that such a market does exist, the Two in Four Rule does not interfere with the promoters' ability to compete in it.  I have no doubt the Two in Four Rule is bad for the plaintiffs' business in the sense that it limits an advantage they have had over the promoters of non-certified events and the member institutions themselves, but the NCAA's decision to limit what is in effect a subsidy for these promoters is not the type of injury the antitrust laws were designed to prevent.

This court has said that "[a]ntitrust standing to sue is at the center of all antitrust law and policy.  It is not a mere technicality.  It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc.*, 949 F.2d at 877.  A private plaintiff may not recover damages or seek injunctive relief under the antitrust laws merely by showing an "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  To obtain relief, the antitrust plaintiff must prove "antitrust injury," which is to say, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant's] acts unlawful." *Id.*  The antitrust laws were intended to prevent injuries to competition.  "Thus, antitrust injuries include only those injuries that result from interference with the freedom to compete." *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998).  The antitrust injury element of standing ensures that a plaintiff can recover only for those losses that stem from the competition-reducing aspects of a defendant's behavior. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Focusing on whether a plaintiff has established antitrust injury forces courts to connect the alleged injury to the purposes of the antitrust laws. *Id.* at 342; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 337, at 306 (2000).

In this case, no one has interfered with the promoters' freedom to compete in the market for Division I men's college basketball games.  In Count I of their complaint, the promoters allege that the NCAA has conspired to restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1994), by "setting the prices" for college basketball games and by "promulgating regulations with the purpose and effect of

restricting or eliminating" plaintiffs' events. In essence, plaintiffs claim that the Two in Four Rule impedes their ability to field a competitive mix of teams for their tournaments, which reduces their attractiveness and causes financial harm to the plaintiffs' business. Of course, antitrust plaintiffs do not suffer antitrust injury merely because they are in a worse position than they would have been had the challenged conduct not occurred. *See Brunswick*, 429 U.S. at 486-87. The antitrust laws were enacted to protect *competition*, not *competitors*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962), and unless the plaintiffs can connect their alleged injury to the purposes of the antitrust laws, they do not have standing to seek antitrust relief.

The plaintiffs here cannot make that connection. These promoters enjoy a subsidy provided by virtue of the NCAA's decision to exempt games that are played in certified events from the normal length of season rules, and the NCAA's decision to limit that subsidy has not caused the promoters to suffer an injury of the type the antitrust laws were designed to prevent. The fact that these tournaments are subsidized by the NCAA is demonstrated by how they began. In the 1960s, the NCAA started exempting participation in certain in-season tournaments from its maximum games limitation in response to concerns about the inability of teams in Alaska and Hawaii to schedule regular season games. In order to encourage teams to travel from the mainland to those states to play, the NCAA decided to allow the games to be played for "free," meaning that they would not count toward the total number of games teams were allowed to play each season. Exempt events initially had to be played outside of the continental United States, but in 1985 the NCAA began conferring exempt status on mainland tournaments like the Preseason NIT. In 1996, the NCAA started requiring tournaments seeking exempt status to go through an annual certification process, hence the name "certified tournament." Participation in a certified tournament now counts as one game for purposes of a team's maximum games limitation. This means that teams participating in certified events can play up to three or four games for the price of one, a feature that makes certified events especially attractive to teams. That is of course what the NCAA hoped to accomplish initially by exempting certain contests from its normal length of season rules. Certification and exemption also give the promoters of certified tournaments a substantial advantage when they are competing with the promoters of non-certified tournaments and the member institutions to schedule teams to play.

The Two in Four Rule is one of the ways the NCAA has tried to limit this subsidy that has encouraged an increase in the number of certified events. The rule prohibits teams from playing in more than one certified event during a given academic year and more than two certified events every four years. The promoters argue that the rule impedes competition in the market for college basketball games because it prohibits them from scheduling high profile teams like Connecticut, Duke, and Kentucky, teams that would otherwise be able to participate in their events every year.

Plaintiffs have not argued that a relevant market exists for certified events. As both parties agree, the relevant market is the market for college basketball games. Nothing about the Two in Four Rule prohibits these promoters from continuing to compete in that market. It does not deny the plaintiffs access to the necessary resources to compete in the market for college basketball games. Those resources are still available. If the promoters want Kentucky, they can get Kentucky every year (provided Kentucky wants to come), by promoting non-certified tournaments or a series of single-game events similar to the ACC-Big Ten Challenge. To do that, they would have to give up the advantage the subsidized format provides them and thus it may be more difficult for the promoters to schedule high profile teams, but forcing the promoters to make this choice has not caused them to suffer antitrust injury. If anything, the Two in Four Rule *increases* competition in the relevant market because it limits an advantage the promoters of certified events have had over the promoters of non-certified events and member institutions, and injury resulting from an increase in competition is certainly not the type of injury the antitrust laws were designed to prevent. *See Brunswick*, 429 U.S. at 487-88.

At bottom, the only injury the plaintiffs have suffered here results from the NCAA's decision to limit a benefit. In *Johnson v. University Health Services*, the Eleventh Circuit held that the plaintiff physician had not suffered antitrust injury as a result of the hospital's decision to deny her a loan guarantee and

subsidies that were necessary to start an independent medical practice: "The only 'injury' that Dr. Johnson alleges is that [University Health Services] failed to confer an extraordinary benefit upon her. . . . Its decision not to subsidize [her] proposed practice is not the type of injury that the antitrust laws were intended to prevent." 161 F.3d at 1338. Similarly, plaintiffs in this case are arguing that the NCAA has caused them injury by failing to confer an extraordinary benefit upon them as often as they would like. This benefit is not required to be able to compete in the relevant market. In fact, the type of injury the plaintiffs are claiming here would be the same without regard to the amount of competition in the market. Antitrust injuries encompass "only those injuries that result from interference with the freedom to compete." *Id.* In this case, the plaintiffs have failed to establish that their alleged injuries are a result of the NCAA's interference with their freedom to compete in the market for college basketball games. They remain just as free to compete in that market now as they were before the adoption of the Two in Four Rule. The antitrust injury requirement demands that we consider whether these particular plaintiffs have suffered the type of injury the antitrust laws were designed to prevent. Because I believe they have not, I agree with the decision to reverse the judgment of the district court.